Jasen, J. (dissenting).
The Stabilization Reserve Corporation Act violates the letter and the spirit of article VIII of the State Constitution. No amount of words can disguise the simple fact that while liability of the city is disavowed, it effectively commits its sources of revenue from the State to the discharge of the obligations of the Stabilization Reserve Corporation. It is, therefore, indistinguishable from a commitment of its credit. The fact is that while the city’s sources of revenue from the State are not committed by existing law but only by annual appropriations, their continuance is economically and governmentally inevitable. The city has, therefore, committed its sources of revenue to the payment of these "debts”; that is tantamount to a commitment of credit economically, practically and, therefore, legally. As a consequence, the act is unconstitutional.
However we might empathize with the plight of local governments in general and the City of New York in particular at this time of unprecedented fiscal crisis, the constitutional limitations upon local finance cannot and should not be *622 blinked. Indeed, judicial condonation of constitutional evasion only prolongs the agony of the cities by postponing to the indefinite future a sensible reappraisal, by those charged with the responsibility, of the need and the form of constitutional limits upon local finance.
The Stabilization Reserve Corporation (SRC), a public corporation, was established in 1974 by act of the Legislature (L 1974, ch 594) to funnel to the City of New York funds deemed necessary to meet its requirements for essential services for fiscal years 1973-1974 and 1974-1975. The statutory scheme is rather simple and resembles in operation other devices increasingly employed in recent years to enable government to meet its burgeoning responsibilities without exceeding constitutional debt ceilings. Essentially, SRC is empowered to issue bonds and notes up to $520 million and is required to deliver such amount to the city for deposit in its general fund. (Public Authorities Law, §§ 2536, 2538, 2539.) Proceeds from the sale of bonds are used to pay principal and interest on the notes. SRC revenues, "voluntary” payments by the city to SRC’s capital reserve fund made upon request of SRC, are used to pay the bonds. (§ 2537.) In the event that the city is unable to make payments to SRC’s capital reserve fund pursuant to this "moral obligation” provision, alternative provisions are made for diversion to SRC of State funds owing the city—Stock Transfer Tax Funds and per capita aid. (§ 2540.) Although it is expressly provided that neither the city nor the State shall be liable on SRC’s debt (§ 2542), the act also provides that establishment expenses for SRC, undefined in the act, shall be borne by the city (§ 2540). Furthermore, SRC owns no property and has no other sources of revenue. Finally, it has no corporate offices, all of its officers and directors are officials of city government and its bonds are sold by the defendant comptroller. (§§ 2546, 2549.)
From what has been said, it should be clear that SRC is a barely disguised technique for debt ceiling avoidance and subverts in varying degrees the constitutional limits upon local finance. While it may be, as is suggested, that SRC lacks a legally independent existence and, hence, that its obligations are truly those of the city (cf. Ayer v Commissioner of Admin. 340 Mass 586), I address myself particularly to the manner in which SRC offends section 1 of article VIII of the Constitution, which bars a gift or loan of the city’s credit in aid of a public corporation and section 5 of article X which provides that no *623 political subdivision of the State shall be liable for the payment of any obligation issued by a public authority.
SRC is purely a financing agency. It owns no property and presently generates absolutely no revenue apart from contributions by the city, or the State, to its capital reserve fund. As noted, should the city default on this moral obligation, the State stands ready to, indeed must, divert to SRC funds due or becoming due the city sufficient to meet SRC’s capital reserve requirements. To that extent at least, the city and to a lesser extent the State, stand behind SRC’s obligations guaranteeing, albeit indirectly, its debt by assuring a fund for debt service. Without this guarantee, SRC could not survive. And while in the first instance the city’s duty to replenish the capital reserve fund is permissive, ultimate funding is assured by virtue of the diversion of stock transfer tax funds or per capita aid from the State should this be necessary. Ultimately, then, SRC services a part of its debt with city funds and thereby assures its continued operation, solvency and the marketability of its securities. This indirect guarantee, a form of credit or debt, thereby offends section 1 of article VIII and section 5 of article X of the Constitution. Moreover, the whole scheme facilitates evasion of the constitutional debt ceiling for the city and in that sense violates the spirit and the tenor of article VIII (§ 4, subd [c]).
Comereski v City of Elmira (308 NY 248) may be distinguished. There the parking authority with which the city contracted to pay an annual sum to be used for service of the authority’s debt had an ostensible purpose. It was not a mere financing device and conduit for evasion of article VIII. And while Comereski holds that the city’s payments were not an unconstitutional gift or loan of credit, the section 5 of article X point was not briefed or argued to the court.
Finally, I am aware that constitutional limits upon debt contracting and taxing powers have been questioned as anachronistic and alternatives have been offered. (See, generally, Bowmar, The Anachronism Called Debt Limitation, 52 Iowa L Rev 863.) A reappraisal of the need and the form of such limitations may be in order so that government might be freed of its nineteenth century straitjacket and permitted to perform its twentieth century functions. Moreover, the SRC and other techniques for debt ceiling avoidance erode the principle of constitutional supremacy. And the limits, as they now stand, only provide incentive for further fragmentation of
*624 governmental function and retard reform of the hodge-podge organizational setup of political subdivisions and governmental finance in the State. (See U. S. Advisory Committee on Intergovernmental Relations, Governmental Structure, Organization and Planning [Report A-5, 1961]; Virtue, The Public Uses of Private Capital, 35 Va L Rev 285, 304.) Also, I would suggest that the present-day confusion and multiplicity of devices could have been, and possibly still may be, avoided by a strict constitutional interpretation voiding them and thrusting upon the Legislature and the people the obligation to alter the Constitution or to provide current support for the projects and services presently furnished through these various questionable, illegal and costly schemes and devices. (See Morris, Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions, 68 Yale L J 234.)
Accordingly, I dissent.
Judges Wachtler, Fuchsberg and Cooke concur with Judge Gabrielli; Judge Jasen dissents and votes to reverse in a separate opinion in which Chief Judge Breitel and Judge Jones concur.
Order modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.